## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

EXOTIC CANOPY SOLUTIONS LLC, a California limited liability company,

     Plaintiffs,

       v.

EASTERN COLORADO HEMP OPERATIONS, INC., a Colorado corporation,
CURNATIV FARMS LLC, a Colorado limited liability company,
LE-AN THAN, an individual, and
RYAN NGUYEN, an individual,

     Defendants.

_____

## VERIFIED COMPLAINT AND JURY DEMAND
_____

Plaintiff Exotic Canopy Solutions LLC ("ECS"), by way of their Verified Complaint against Defendants Eastern Colorado Hemp Operations, Inc. ("ECHO"), Curnativ Farms LLC ("Curnativ"), Le-An Than, and Ryan Nguyen (collectively, "Defendants"), allege the following:

### I.    <ins>INTRODUCTION</ins>

1.    ECS is a California registered hemp grower in the business of selling hemp seeds and plants. It owns a valuable hemp cultivar known as Hempress 3 ("H3"), prized by many hemp farmers for its high CBD concentration and consistently low THC concentration, high yield, and attractive flowers.

2.    On January 24, 2020, ECS entered a seed production agreement with ECHO and Curnativ under which ECHO agreed to grow, harvest, process, and deliver a seed crop of an

anticipated four million H3 seeds by June 12, 2020 (the "Contract").  The parties agreed that the seeds would be free of mold and contaminants and would meet a minimum germination rate of 80%.  In return, ECS would provide ECHO $50,000 in working capital and pay a contractually set price per seed.

3.       As ECS came to learn, Defendants had misrepresented ECHO's experience growing hemp and the availability of its greenhouses for growing ECS's crop.  As a result of ECHO's failure to follow industry standard practices, the seed crop was blighted by mildew and had a high dormancy rate.  ECHO's incompetence led to a late harvest, making delivery by June 12, 2020, impossible.  When ECHO finally completed the testing required as a prerequisite for delivery, the seed crop not only tested positive for mold and heavy metals, it had such a low germination rate that it qualified as crop failure under the Contract.

4.       ECHO and Curnativ did not perform under the Contract, producing seeds that fell short of contractual specifications and then refusing to deliver those seeds to ECS on the terms set forth in the Contract.  Defendants are now holding hostage nearly four million seeds that rightfully belong to ECS, threatening to sell those seeds unless ECS pays a price beyond the parties' bargain.

## II.     PARTIES

5.       Plaintiff ECS is a California limited liability company organized and existing under the laws of the state of California.  Its principal place of business is located at 99 Big Break Rd, Oakley, California 94561.  Its principals include Beth Jones, Jesse Niesen, and Nathan Tanner.

6.       Defendant ECHO is a corporation organized and existing under the laws of the state of Colorado.  Its principal place of business is located at 5561 County Road I, Wiggins, Colorado

80654.

7.      Upon information and belief, Defendant Le-An Than is a resident of the state of Colorado.  She represents herself to be the President of ECHO and executed the Contract on behalf of ECHO.

8.      Defendant Curnativ is a Colorado limited liability company organized and existing under the laws of the state of Colorado.  Its principal place of business is located at 1555 California St, Unit 313, Denver, Colorado 80202.

9.      Upon information and belief, Defendant Ryan Nguyen is a resident of the state of Colorado.  He represents himself to be the President and CEO of Curnativ and executed the Contract on behalf of Curnativ.

### III.    JURISDICTION AND VENUE

10.      This Court has personal jurisdiction over each of the named Defendants.  ECS, ECHO and Curnativ expressly consented to the personal jurisdiction of this Court in Section 17 of the Contract.  Furthermore, as alleged herein, each of the Defendants has had continuous and systematic contacts with the state of Colorado, each operating businesses within the state of Colorado, and this action arises out of and relates to those activities.

11.      This Court also has subject matter jurisdiction over the entirety of the action pursuant to 28 U.S.C. § 1332 because Plaintiff ECS is a citizen of a different state than any of the Defendants, and the amount in controversy exceeds $75,000.

12.      Venue is proper in this judicial district because virtually all of the events giving rise to ECS's claims occurred within the District of Colorado.  The Contract was executed by the

Defendants in Colorado and performed in Colorado.  ECS, ECHO and Curnativ also expressly consented to this venue in Section 17 of the Contract.

## IV.   FACTUAL ALLEGATIONS

### A.   Hemp in the United States

13.   Congress defined hemp in the Agriculture Improvement Act of 2018, 7 USC § 1609(o), (the "2018 Farm Bill") as "the plant Cannabis sativa L. … including the seeds thereof … with a delta-9 [THC] concentration of not more than 0.3 percent ...."  The 2018 Farm Bill distinguished hemp from marijuana (also the plant *Cannabis sativa L.*) on the basis of THC concentration and made it legal to commercially cultivate hemp, and to transport hemp, including its seed, across state lines.

14.   Hemp is predominately grown in the United States for its cannabinoid content, specifically, cannabidiol (CBD).  Hemp is a dioecious plant, meaning male or female reproductive organs appear on different plants.  The desirable cannabinoid content is concentrated within female plants.  Male plants are significantly less valuable leading farmers to seek "feminized seed" with high germination rates to ensure a female crop and achieve the greatest yield per seed. In agriculture, the germination rate describes how many seeds of a particular plant species, in this case hemp, are likely to germinate (grow) over a given period of time. A germination rate of 85% indicates that about 85 out of 100 seeds will be probably germinate (grow) under proper conditions.

15.    Furthermore, hemp is often grown outdoors in the United States and the plants' cannabinoid content can be influenced by weather conditions.  As such, the cultivation cycle for hemp, from planting to harvest, must be carefully timed and orchestrated to maximize yields and

returns, and to mitigate the risk of crop loss stemming from elevated levels of THC.

**B.     ECS Acquires the Hempress 3 Cultivar**

16.     Because of strict legal restrictions on THC levels in hemp found in the 2018 Farm Bill and state laws, farmers must find a reputable source of seeds that are consistently low in THC while maintaining high feminization and germination rates.  ECS's proprietary hemp cultivar, H3, is such a seed.

17.     H3 is especially desirable to hemp farmers due to its high CBD concentration and consistently low THC concentration, high yield, and attractive flowers.  Since acquiring material transfer, propagation and breeding rights to the H3 cultivar in 2019, ECS has sought to maintain objective quality standards, including high feminization rates (99%) and germination rates (variable but typically +90%), and the absence of measurable contaminants, such as mold and heavy metals.  Like other reputable hemp seed companies, ECS documents these quality standards to potential customers through test results displayed on a dedicated website: hempress3.com. These standards are critical and vital to the sales and marketing of these seeds. ECS also makes public additional documentation to evidence the regulatory compliance of the H3 seed and ECS's operations.  These quality standards and associated supporting documentation positively affect the price that ECS can charge for its seeds, as well as the reputation of the H3 brand.

18.     In late 2019, Jesse Niesen of ECS met Ryan Nguyen of Curnativ.  Knowing that ECS was looking for partners to produce H3 seeds that ECS would sell to third parties and/or cultivate to produce marketable flower, Mr. Nguyen recommended ECHO, a farm in Wiggins, Colorado.  Mr. Nguyen represented that ECHO had the experience necessary to grow a hemp crop

indoors and harvest and process seeds.  At ECS's request, on or around January 14, 2020, Mr. Nguyen sent videos and photos of ECHO's four greenhouses that clearly showed climate control systems in two of those greenhouses.

19.     On or around January 17, 2020, ECS sent a draft seed production contract between ECS and ECHO.  Over the next week, the parties exchanged multiple drafts that reveal substantial negotiation over key terms, including minimum acceptable germination rate, the definition of crop failure, delivery date, and payment terms.  In addition, Curnativ insisted on being made a party to the contract and was willing to accept joint and several liability with ECHO in exchange for its participation.

### C.     The Seed Production Contract

20.     ECS, ECHO, and Curnativ executed the Contract on January 24, 2020.   The Contract is attached as **Exhibit A**.  Under the Contract, ECS supplied ECHO with 6,200 of its proprietary H3 seeds which ECHO would use as stock to produce a seed run with a target of producing a crop of approximately four million seeds (Sec. 1(a)(i)).  ECHO expressly agreed to accomplish each of the following terms "for harvest on a timeline satisfactory to render SEED CROP ready for shipment not later than June 12, 2020" (Sec. 3):

    a.  Plant, manage, and cultivate the seed crop (Sec. 1(b)(i));

    b.  Harvest the crop and process the seeds, which shall include cleaning, drying and curing the seeds in jars (Sec. 3(d));

    c.  Submit seed samples for testing (Sec. 3(e)); and

    d.  Provided the seed crop meets minimum quality criteria, package the seeds for

delivery to ECS (Sec. 3(h)).

In other words, it was ECHO's responsibility to time harvest and processing of the seed crop to meet the Contract's June 12, 2020 deadline.

21.     The Contract also states that ECHO shall, "[a]t all times, possess a valid registration for hemp cultivation from the State of Colorado and observe all applicable Federal, State and local regulations for hemp production." (Sec. 1(b)(ii).)

22.     Payment to ECHO and Curnativ for the seed crop was contingent on ECHO's satisfaction of minimum quality standards.  If the seed crop achieved a 99% feminization rate and an 85% germination rate, ECS would pay ECHO and Curnativ a fixed price of $0.27 per seed produced and delivered (Sec. 8(a)).

23.     However, failure to meet minimum quality criteria would result in a crop failure that would shift the responsibility of the parties with respect to performance and compensation (Sec. 1(f)). Section 10(a) of the Contract states:

> *"A crop failure shall occur when <u>any</u> of the following conditions are met: [emphasis in original]*
>
>   i.   *Feminization rate under 95%.*
>  ii.   *Germination rate under 80%;*
> iii.   *Total THC in excess of 0.30% in any test from an accredited lab or if SEED CROP fails in any manner during required pre-harvest Compliance Testing performed in accordance with the State of Colorado Department of Agriculture's rules.*
>  iv.   *Seeds are unharvested.*
>   v.   *Seeds are unwashed.*
>  vi.   *Seed tests show evidence of disease, mold, contaminants, or the use of illegal pesticides."*

7

24.     In the event of a crop failure, ECS would not be required to pay ECHO and Curnativ for the seed crop.  The Contract clearly outlines the following remedies for crop failure:

    a.  Curnativ must repay 100% of the working capital upon demand by ECS by no later than July 12, 2020 (Sec. 2(d));

    b.  If crop destruction is not deemed necessary, ECHO and Curnativ must package 90% of the seed crop and deliver it for shipment to ECS by June 12, 2020 (Sec. 10(b)(iv)); and

    c.  ECS shall not owe any payment to ECHO or Curnativ (Sec. 10(b)(iv)).

25.     At the Defendants' request, ECS agreed to provide ECHO $50,000 in working capital (Sec. 2(a)).  This working capital was not gifted to ECHO.  Rather, it functioned as a conditional advance on seeds that ECHO would produce for ECS under the Contract.  Assuming a successful seed crop, an amount of seeds valued at $50,000 would be delivered to ECS with no additional payment due to either ECHO or Curnativ (Sec. 2(c)).

26.     Importantly, the Contract also contains a mutual liability provision by which Curnativ and ECHO agree to share joint and several liability for the execution of, and conformance to, the terms and conditions of the Contract and any actions, claims, or damages arising from any material breach of the Contract (Sec. 27).

### D.     Seeds Are Planted; Working Capital Paid

27.     On or about January 28, 2020, ECS delivered 6,839 H3 seeds to ECHO.  As specified in the Contract, 200 seeds were submitted to the Colorado State University Seed Laboratory for baseline testing.  The test results, received on February 3, evidenced the H3 seed

stock ECS provided to ECHO had a feminization rate of 99% and a germination rate of 99%.

28.     ECS's primary point of contact at ECHO from January to mid-June 2020 was Mr. Dray Wharton.  Mr. Wharton helped draft the Contract and held himself out to ECS as an investor in and owner of ECHO, as legal counsel to ECHO, and as an experienced hemp farmer.

29.     On February 12, the Chief Operating Officer of Curnativ, Evan Romero, sent ECS an email, copying Mr. Nguyen, attaching a weekly planting report that included the Combined Planting and Harvest Report ("February Planting Report") that ECHO had submitted to the Colorado Department of Agriculture.  The February Planting Report is attached as **Exhibit B**.  The February Planting Report, which was signed by Ms. Than on February 3, included a Variety Report that stated that ECHO had planted the majority of the H3 seed stock on January 31 in four greenhouses (G1, G2, G3, and G4) encompassing 6,240 square feet.

30.     Both Mr. Nguyen and Ms. Than were aware and approved of the February Planting Report being shared with ECS.

31.     Relying on the representations in the February Planting Report, which were consistent with the images shared by Mr. Nguyen in January, ECS believed that it had exclusive use of four greenhouses, that H3 seed had been planted in all four of the greenhouses, and that at least two of these greenhouses were climate-controlled (G1 and G2).

32.     In the months that followed, ECS paid $50,000 in working capital funds.  The final payment due under Section 2 of the Contract was paid to ECHO on May 20, 2020.

33.     ECS first learned that ECHO might not perform under the Contract on April 22 when Mr. Wharton revealed that the H3 crop had been afflicted by powdery mildew.  Furthermore,

Mr. Wharton disclosed that only three greenhouses were being used to grow the H3 crop (G2, G3, and G4), only one of which was partially climate-controlled (G2).  As ECS came to learn, ECHO had sold one of its climate-controlled greenhouses (G1) to another customer, leaving only one partially climate-controlled greenhouse for growing H3 seeds.

34.     Naturally, the outbreak of powdery mildew was prevalent in the two non-climate-controlled greenhouses (G3 and G4), where high humidity allowed powdery mildew to flourish. This outbreak ultimately led to the seed crop testing positive for mold.

35.     Upon information and belief, Ms. Than and Mr. Nguyen were aware of and approved of the sale of the G1 greenhouse to another customer.

36.     On an April 25 call, Mr. Wharton revealed ECHO's plan to commence harvest of the H3 crop on or about May 25, followed by a four-day drying period and a 14-day cure period. This is significantly less than industry standard, as curing for less than 30 days is likely to lead to a low germination rate.  Although Ms. Jones and Mr. Niesen expressed willingness to amend the Contract to allow a later delivery date (thus giving the seed crop more time to cure), Mr. Wharton unequivocally insisted that ECHO could and would honor the Contract and deliver the H3 seed crop by June 12.

37.     To combat their growing concerns about ECHO's ability to complete the Contract, ECS dispatched Mr. Niesen and Mr. Tanner to the ECHO farm around May 11, 2020, to provide advice and technical assistance on hemp cultivation and management.

38.     Following this visit, on a phone call on May 21, Mr. Niesen warned Mr. Wharton and Mr. Nguyen that ECHO would have a hard time meeting the 80% germination rate specified

in the Contract using less than an industry standard 30-day cure period.  Again, Mr. Niesen offered

to amend the delivery date under the Contract to accommodate ECHO's planned May 25 harvest,

and again ECHO rejected the offer.  Mr. Wharton insisted that ECHO would stick to its compressed

19-day time frame and even acknowledged the risks of ECHO's approach: "Yup. It is incongruent

with industry standard, but we're going to make it happen, and we will lose some of the seed and

that viability, but that June 12th date has been in there since the beginning."

39.     Upon information and belief, ECHO harvested the entire H3 crop on or about May

28, leaving approximately two weeks for ECHO to prepare the seed crop, complete the required

testing, and deliver the seed crop for shipment to ECS.  The parties reviewed the costs and lead

time for the required testing via email, but on June 3, Mr. Wharton rejected Curnativ's suggestion

to pursue expedited testing as unnecessary, which validated ECS's expectation that the June 12,

2020, deadline specified in the Contract could and would be performed upon.

**E.     Crop Failure Occurs**

40.     The Contract imposes two primary obligations on ECHO and Curnativ: produce a

seed crop meeting the minimum quality criteria specified in Section 7 of the Contract and deliver

such seed crop for shipment to ECS on or before June 12, 2020.  ECHO and Curnativ failed in

both respects.

41.     By June 12, ECHO and Curnativ had failed to perform all testing required under

the Contract.  When all test results were finally available on June 17, it was clear that a crop failure

had occurred under Section 10(a).  In particular,

        a.  The heavy metals test (issued to Curnativ on June 9) evidenced the presence of lead

(0.086 ppm) and cadmium (.052 ppm) in the seed crop.  This evidence of toxic contaminants alone is sufficient to constitute crop failure under Section 10(a)(vi) of the Contract;

b.  The microbial test results (issued to Curnativ on June 12) evidenced the presence of yeast and mold on the seed crop.  This evidence of yeast and mold contaminants alone is sufficient to constitute crop failure under Section 10(a)(vi) of the Contract; and

c.  The germination test results (issued to ECS and ECHO on June 17) evidenced a germination rate of 50%.  This shockingly low figure is well below the threshold of 80% and alone constitutes evidence of a crop failure under Section 10(a)(ii) of the Contract.

42.     Meanwhile, the June 12, 2020 deadline by which ECHO had to package and deliver seeds for shipment to ECS came and went.  It was around this time that Ms. Than of ECHO informed ECS that Mr. Wharton had been fired.  His termination from ECHO was later confirmed in a June 22 email between Ms. Than, Mr. Nguyen, Ms. Jones, and Mr. Niesen, among others. Although Mr. Wharton had represented himself to ECS as an owner of ECHO, as legal counsel to ECHO, and as an experienced hemp farmer, he was, in fact, none of these things.

43.     Despite clear failure to perform under the Contract, on June 13 ECHO offered to send ECS a small shipment of H3 seeds on an "as is" basis, reflecting ECHO's failure to achieve the minimum quality criteria specified in Section 7.  Despite their deficiencies, ECS accepted delivery of six pounds of H3 seed (approximately 189,000 seeds) a few days later with the

understanding that, if a crop failure had occurred, this initial seed delivery would count towards the 90% of the seed crop that ECS would be due under Section 10(b)(iv) of the Contract.

44.     To this day, ECHO retains custody of approximately 4,065,218 H3 seeds.  As of June 15, ECHO reported that the seed crop comprised 3,356,718 grade A seeds and 388,500 grade B seeds.  ECS later learned that ECHO also possessed eight pounds (approximately 320,000 seeds) of grade C seed that were previously unreported.

**F.     Following the Crop Failure, ECHO and Curnativ Fail to Perform.**

45.     On June 22, 2020 ECS sent ECHO and Curnativ a formal written notice asserting breach of the Contract due to, inter alia, crop failure and ECHO's failure to deliver a quality seed crop by June 12, 2020.  In this notice, ECS reiterated the remedies it is due under Section 10(b)(iv) of the Contract: (i) delivery of 90% of the seed crop; and (ii) repayment of the $50,000 in working capital to be paid on or before July 12, 2020.

46.     ECHO has refused to accept that a crop failure has occurred – despite clear evidence to the contrary – and has demanded monetary compensation before agreeing to deliver the seed crop to ECS.  Curnativ has disclaimed all responsibility for the seed crop notwithstanding the mutual liability provision of the Contract.  Despite multiple efforts to reach an amicable solution with the Defendants, ECS has been left with no choice but to file this Complaint.

47.     To date, ECHO and Curnativ continue to deprive ECS of its property by holding ransom a proprietary seed crop they have no right to utilize or sell while they continue to act in breach of the Contract by refusing to package and deliver to ECS 90% of the H3 seed crop (approximately 3,469,696 H3 seeds taking into account seeds that have already been delivered)

and repay ECS its $50,000 working capital investment.

48.     ECHO and Curnativ's rights to the remaining 10% of the seed stock (approximately 406,522 seeds) are subject to their receipt of a limited license from ECS for commercial seed sale purposes.  Under Sec. 10(b)(iv) of the Contract, ECHO and Curnativ have no material rights, breeding rights, or propagation rights to the H3 seeds.

49.     In a communication dated August 13, 2020, ECHO's counsel has asserted a right to sell the seed crop to satisfy amounts it claims to be owed.  This remedy is not what the parties bargained for in the Contract.

50.     As a result of non-performance by ECHO and Curnativ, ECS has suffered dire financial consequences.  The 2020 growing season for hemp has ended in most of the United States and the seed crop could only be sold at discount to account for the low germination rate and presence of contaminants including mold and heavy metals.  These actions have not only harmed ECS financially but have damaged their reputation and standing with customers in an increasingly competitive marketplace.

## V.     CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Breach of Contract**
**(Against ECHO and Curnativ)**

51.     ECS re-alleges and re-incorporates the above paragraphs by reference as though fully set forth herein.

52.     The Contract (**Exhibit A**) created a binding contract.

53.     ECHO and Curnativ are parties to the Contract with ECS.

54.     ECHO and Curnativ are jointly and severally liable for execution of, and conformance to, the terms and conditions of the Contract, and any actions, claims, or damages arising from any material breach of the Contract.

55.     ECS performed under the Contract by, inter alia, providing ECHO with 6,839 H3 seeds as seed stock and providing working capital in the amount of $50,000.

56.     Defendants jointly and severally breached the Contract by:

a.   Failing to deliver the H3 seed crop by June 12, 2020;

b.   Failing to perform the following in light of the crop failure:

o   Repay 100% of the working capital of $50,000 by July 12, 2020;

o   Package 90% of the seed crop and deliver it for shipment to ECS by June 12, 2020.

57.     The 189,000 H3 seeds that were delivered to ECS to date have a limited value and Plaintiff is making all reasonable efforts to mitigate its loss and recover value for these seeds, including by selling the seeds at a discounted rate and by planting seeds to produce marketable biomass.  However, the delivered seed has yet to exhibit a germination rate above 75%, and the measurable presence of contaminants has limited the pool of potential buyers.

58.     As a direct and proximate result of Defendants' joint and several breaches of the Contract, Plaintiff has suffered damages by being deprived of the value of 90% of the seed crop, whose value we believe to be not less than $3,400,302.08.  Plaintiff has suffered further injury by being deprived of $50,000 it is owed under the Contract.

## SECOND CAUSE OF ACTION
### Unjust Enrichment
### (Against ECHO and Curnativ)

59.    ECS re-alleges and re-incorporates the above paragraphs by reference as though fully set forth herein.

60.    ECS is entitled to 90% of the seed crop and $50,000 per Section 10(b)(iv) of the Contract.

61.    ECHO and Curnativ are refusing to transfer this portion of the seed crop to ECS.

62.    ECHO and Curnativ are refusing to pay ECS $50,000.

63.    Defendants ECHO and Curnativ knowingly received the benefit of Plaintiff's monies and seed crop and have unjustly retained them.

64.    Defendants have been unjustly enriched by their unlawful retention of Plaintiff's property, in an amount whose value is no less than $3,450,302.08.  It would be in the interest of equity for this benefit to be awarded to Plaintiff.

## THIRD CAUSE OF ACTION
### Civil Theft
### (Against ECHO and Curnativ)

65.    ECS re-alleges and re-incorporates the above paragraphs by reference as though fully set forth herein.

66.    At all times, title and ownership of the H3 seed stock and resulting H3 seed crop remained with ECS.

67.    Because there was a crop failure under the Contract, ECHO and Curnativ were obligated to package 90% of the seed crop and to deliver that amount for shipment to ECS by June

12, 2020.

68.     ECHO and Curnativ have reported 4,065,218 seeds were produced under the Contract (3,356,718 grade A seeds, 388,500 grade B seeds, and approximately 320,000 grade C seeds).

69.     ECS is entitled to 90% of this total, representing 3,658,696 seeds.  To date, ECHO and Curnativ have only delivered 189,000 of these seeds to ECS.  ECHO is therefore in possession of approximately 3,469,696 H3 seeds that belong to and must be returned to ECS.

70.     ECHO and Curnativ's rights to the remaining 10% of the seed stock (approximately 406,522 seeds) are subject to their receipt of a limited license from ECS for commercial seed sale purposes.  ECHO and Curnativ have no material rights, breeding rights, or propagation rights to the H3 seeds.

71.     Upon information and belief, ECHO is physically holding the seed crop at its facility in Wiggins, Colorado.

72.     ECHO and Curnativ have refused to ship to ECS the 3,469,696 seeds that ECS are due and continues to physically possess the seed crop.

73.     ECHO demands monetary compensation as a condition of delivering the seeds that rightfully belong to ECS, even though the Contract states that ECHO is only entitled to compensation in the form of 10% of the seed crop and not additional monetary compensation. Recently, ECHO has claimed a right to sell the seed crop if it is not paid by ECS.

74.     Plaintiff has suffered actual damages as a result of ECHO's actions equal to the value of the 3,469,696 seeds that ECHO has wrongfully retained and threatened to sell, worth no

less than $3,400,302.08.  Pursuant to Colorado's Civil Theft Statute, C.R.S. § 18-4-405, ECS is entitled to compensation from Defendants equal to three times the amount of its actual damages, as well as costs and reasonable attorney fees.

**FOURTH CAUSE OF ACTION**
**Fraud**
**(Against All Defendants)**

75.     ECS re-alleges and re-incorporates the above paragraphs by reference as though fully set forth herein.

76.     The Defendants made intentionally and materially false representations to ECS regarding the total number of greenhouses, the number of climate-controlled greenhouses, and the amount of square footage that would be dedicated to producing the H3 seed crop, including but not limited to:

    a.   On January 14, 2020, Mr. Nguyen shared photos and video with ECS that showed four greenhouses, two of which were climate-controlled; and

    b.   On February 3, 2020, Ms. Than signed the February Planting Report (**Exhibit B**) documenting that, on January 31, 2020, ECHO planted H3 seeds in all four greenhouses (1,160 seeds planted in G1, 1,160 seeds planted in G2, 1,960 seeds planted in G3, and 1,960 seeds planted in G4).  The February Planting Report was shared with ECS at Mr. Nguyen's direction on February 12, 2020.

77.     At least as of January 31, 2020, the date of planting, Defendants knew that their material misrepresentations were not true, yet they intentionally shared these misrepresentations with ECS.

78.     ECS actually and justifiably relied upon each and every one of the aforementioned intentional misrepresentations, to its detriment.

79.     As the direct and proximate result of Defendants' misrepresentations, ECS has incurred damages in the form of a seed crop that was contaminated with mold from cultivation in greenhouses that were not climate-controlled and in the form of a lower quality seed yield stemming from the limited and constrained square footage of greenhouses dedicated to producing, drying, and curing the H3 seed crop.  Further, as the direct and proximate result of Defendants' joint and several frauds upon ECS, ECS has also incurred incidental and consequential damages including lost profits and lost business opportunities, interest, costs, and attorney's fees.

## VI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff ECS respectfully requests the following relief:

80.     Judgment in favor of ECS and against Defendants on each cause of action alleged herein;

81.     Under the facts and circumstances presented herein, ECS requests a declaratory judgment by which the Court declares, among other things:

    a.   That ECS is the lawful owner of the H3 seed crop;

    b.   That ECS is entitled to recover reasonable attorney fees and costs;

    c.   That ECS owes no further monies or payments to ECHO or Curnativ;

    d.   That ECHO and Curnativ may only sell their 10% of the seed crop under a limited license granted to them by ECS for commercial seed sale purposes and that ECHO and Curnativ have no material rights, breeding rights, and propagation rights to the

H3 seeds;

82.     On Count I, Plaintiff ECS prays for judgment against Defendants ECHO and Curnativ, jointly and severally, in the amount of $3,450,302.08 in contract damages, together with statutory pre-judgment and post-judgment interest, costs and any other relief the Court deems just;

83.     On Count II, Plaintiff ECS prays for judgment against Defendants ECHO and Curnativ, jointly and severally, in the amount of $3,450,302.08 together with incidental and consequential damages, pre-judgment and post-judgment interest, costs and any other relief the Court deems just;

84.     On Count III, Plaintiff ECS prays for judgment against Defendants ECHO and Curnativ, jointly and severally, in the amount equal to three times the value of the seed crop owed to ECS which totals approximately $10,200,906.20, an award of reasonable attorney's fees, together with statutory pre-judgment and post-judgment interest, costs and any other relief the Court deems just; and

85.     On Count IV, Plaintiff ECS prays for judgment against all Defendants in an amount equal to no less than $3,400,302.08 in compensatory damages, punitive damages against Defendants ECHO and Curnativ, an award of reasonable attorney's fees, together with statutory pre-judgment and post-judgment interest, costs and any other relief the Court deems just;

86.     Granting ECS such other and further relief as this Court deems proper.

## VII.     <u>JURY DEMAND</u>

87.     ECS demands a trial by jury on all issues so triable.

Dated this 25th day of August, 2020.

                                             Respectfully submitted,

By:   _s/ *Jennifer Cabrera*_
       Jennifer Cabrera
       Corey Cox
       Michelle Bodian *(not admitted to*
       *practice in the District of Colorado)*
       VICENTE SEDERBERG LLP
       455 Sherman Street, Suite 390
       Denver, CO 80203
       Telephone: 303-860-4501
       Emails:   j.cabrera@vicentesederberg.com
                  corey@vicentesederberg.com
                  m.bodian@vicentesederberg.com

       ATTORNEYS FOR PLAINTIFF EXOTIC
       CANOPY SOLUTIONS LLC

## **VERIFICATION**

I, Beth Jones, am the Co-Chief Executive Officer of Exotic Canopy Solutions LLC ("ECS"), and I am authorized to sign this verification on ECS' behalf. I have read the foregoing Verified Complaint. The facts set forth therein are true and accurate to the best of my knowledge based on the information available to me.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 25th day of August, 2020.

Beth Jones
Co-Chief Executive Officer
Exotic Canopy Solutions LLC